[Cite as *In re N.R.*, 2013-Ohio-2327.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| IN THE MATTER OF N.R. | : | JUDGES: |
|  | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. Patricia A. Delaney, J. |
|  | : | Hon. Craig R. Baldwin, J. |
|  | : |  |
|  | : |  |
|  | : | Case No. 2013CA00021 |
|  | : |  |
|  | : |  |
|  | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Civil appeal from the Stark County Court of
                             Common Pleas, Juvenile Division, Case
                             No. 2011JCV01464

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      June 3, 2013

APPEARANCES:

For-Appellee                         For-Appellant

QUAY COMPTON                         MARK OSTROWSKI
SCDJFS                               Stark County Public Defender
Canton, OH  44702                    201 Cleveland Ave. S.W., Ste. 104
                                     Canton, OH  44702

*Gwin, P.J.*

{¶1}    Appellant N.T. appeals from the January 10, 2013 judgment entry of the Stark County Court of Common Pleas, Juvenile Division, terminating his parental rights and granting permanent custody of N.R. to Stark County Department of Job and Family Services ("SCDJFS").

*Facts & Procedural History*

{¶2}    N.R. was born on February 21, 2010 and is the biological child of Mother and appellant N.T. ("Father").  On October 20, 2011, SCDJFS filed a complaint alleging N.R. was a dependent, neglected, and abused child.  The complaint alleged, in part, that N.R. was taken to the hospital with serious burns on both of his hands and Mother admitted she held N.R.'s hands under the hot water faucet when he would not calm down.  Further, that Mother and Father have a history of domestic violence.  On November 16, 2011, Father stipulated to a finding of abuse and stipulated to a case plan provided by the SCDJFS to facilitate his reunification with N.R.  In the case plan, Father was ordered to: (1) complete a parenting evaluation at Northeast Ohio Behavioral Health and follow all recommendations; (2) successfully complete Goodwill parenting; (3) receive an evaluation at Quest and follow all treatment recommendations; (4) maintain stable housing and employment; and (5) attend visitations with N.R. weekly.  On November 30, 2011, Mother stipulated to a finding of abuse and N.R. was adjudicated an abused child as to both parents.  Also on November 30, 2011, a dispositional hearing was held and the trial court granted temporary custody of N.R. to SCDJFS.

{¶3} SCDJFS filed a motion for permanent custody of N.R. on September 12, 2012. SCDJFS alleged Father failed to comply with the recommendations from his parenting evaluation and failed to maintain a consistent relationship with N.R., not visiting N.R. since April 20, 2012. An annual review hearing was held on September 13, 2012. The judgment entry indicates Father was advised it was his responsibility to confirm a release was signed for Quest records and to notify the guardian ad litem about new housing and job. On October 22, 2012, Father filed a motion for first extension of temporary custody, indicating he sought to continue to work on his case plan. A hearing on the motion seeking permanent custody and Father's motion for first extension of temporary custody was held on December 12, 2012. Prior to the testimony of the witnesses, Mother stipulated to permanent custody.

{¶4} At the hearing, Michaele Singleton ("Singleton"), the ongoing case manager from SCDJFS, testified she met with Father to review the services required in his case plan. Father was reluctant to complete some services. Singleton referred Father to Stark Social Worker's Network to assist him with a myriad of services, including assistance with rent or housing certificates. Singleton stated Father utilized these services for a period of time, but then stopped communicating with the agency. Singleton stated after N.R. was placed in agency custody, Father's visitation was sporadic and he sometimes failed to appear at scheduled visits. After Father failed to show for several visits, a plan was put into place whereby Father would call in to confirm he was coming to the visit before N.R. was transported. Singleton testified Father did not visit with N.R. from April 18, 2012 until September of 2012 when he first began attending Goodwill parenting classes. Singleton attempted to contact Father during this

time using the contact information she had, but she did not know his whereabouts. Singleton left messages at the phone number she had for Father. Father called Singleton one time during this time period, telling her he was having difficulties and would have to suspend visitation with N.R.

{¶5} Singleton testified Father started Goodwill parenting classes in September of 2012 and there were some concerns about his interactions with N.R. and thus the further service of Intensive Parent Child Interaction program would be recommended at the conclusion of the Goodwill parenting program. Singleton stated she does not believe Father can provide care and support for N.R. because he does not have housing or employment. Her concern is that Father would still not be stable in six months in terms of maintaining a home, maintaining employment, and meeting the basic needs of N.R. It is Singleton's opinion that Father has not successfully completed his case plan.

{¶6} When testifying about the best interest of N.R., Singleton stated he has been in the same foster home since October of 2011. N.R.'s hands have healed after extensive therapy and he is in good health. N.R. is bonded with his foster mother and is traumatized when separated from her. Singleton testified no other family members have come forward to seek custody of N.R. Father told Singleton there might be relatives in Columbus interested in seeking custody of N.R., but no one has come forward to express interest to Singleton. N.R. has a consistent routine every day, including attending preschool. Singleton stated a bond between N.R. and Father did exist, but has been severed due to a lengthy separation. Singleton testified the benefit of permanency outweighs any harm of not seeing Father and Father cannot provide the

same stability N.R. currently enjoys. Though the visits with Father went well and there is a chance Father might be able to accomplish more of the case plan if temporary custody is extended, Singleton testified she believes it is in the best interest of N.R. for permanent custody to be granted to SCDJFS. It is Singleton's opinion that additional time would not correct the damage done by Father failing to visit from April to September and failing to address the concerns noted with Father's ability to parent.

{¶7} Dr. Aimee Thomas ("Thomas") of Northeast Ohio Behavioral Health conducted a parenting assessment on Father. There was no indication Father would harm his son. Thomas had concerns with Father's level of commitment to his older child and about substance abuse. Thomas stated Father initially resisted Goodwill parenting classes because he perceived it as punishment, but Father told her he would follow through with the classes. Thomas testified it would be unusual for a parent to stop visiting their child for five months, it demonstrates issues with commitment and attachment and is a source of serious concern in terms of Father being able to properly bond with N.R.

{¶8} Jennifer Fire ("Fire") is a parenting instructor and case manager at Goodwill Industries and is Father's parenting instructor. Fire testified as to Father's participation and progress in the program. Father first began the program on September 17, 2012. Despite Fire's explanation to Father that he must provide diapers, supplies, and food during visits with N.R., Father continually did not come prepared with food or supplies. Father made some improvements during the class and did well in the classroom portion of the program, but had a hard time applying the skills to visits with N.R. Fire stated Father did not have a good understanding of developmental stages,

was short-fused when N.R. cried, and wanted N.R. to "sit still." Fire testified Father's progress was hindered by his blaming and pointing fingers and some of Father's interactions with N.R. were troubling. For example, during one visit when N.R. cried, Father stated he needed a break and that if SCDJFS had not taken N.R. away, Father would have molded him to respect him the way he should by now.

{¶9} While a home visit is typically part of the program, Fire was unable to complete a home visit because Father did not maintain independent housing. Fire stated Father will receive a level of participation certificate and he completed 21 out of 24 goals with the program. Because Father often became angry and frustrated with N.R., Fire stated the Goodwill staff will recommend that he participate in Intensive Parent Child Interaction Classes. When Fire discussed the IPCI classes, Father told her it would be more time-consuming then he wanted, but Fire stated it is possible Father could complete the program in thirteen weeks. Fire does not recommend unsupervised visitation between Father and N.R. and has concerns about Father's ability to provide and care for N.R. due to his financial and emotional instability and lack of consistency.

{¶10} Lisa Minear from Quest Recovery conducted individual counseling with Father for six weeks. She testified he was cooperative and was successfully discharged. Minear last saw Father in January of 2012.

{¶11} Father testified he came to the United States from Kenya in 2005 to run track and subsequently lost his scholarship due to injuries. Father stated he was employed in the technology field for several years and had a bond with N.R. when he was born. After Father and Mother ended their relationship, Father had to leave the

home.  Father was not present when N.R.'s hands were injured and did not know about the incident until two weeks later.  When he went to visit N.R. during these two weeks, no one answered the door.

{¶12} Father stated he understood in November of 2011 that he was supposed to visit N.R. weekly, go to Northeast Behavioral Health for a parenting assessment, and go to Quest for counseling.  When he received the report from Northeast Behavioral Health in February of 2012, he knew he had to attend Goodwill parenting classes.  Father testified he did not start the classes until September or October of 2012 because he thought attendance was just a "recommendation" and he had other "stuff I had to do."  Father admits he went from April 20, 2012 to September of 2012 without visiting N.R., which is more than ninety days.  When asked why he did not visit, Father explained that in July of 2012 he was mugged and was in the hospital for a week.  He did not visit the other portion of the five months because he was homeless and had no transportation, often sleeping at bus stops and shelters.  Father testified he had a house for one month, but could not keep up with the rent and is therefore currently homeless and living with a friend.  Father is not currently employed.  Father stated he cannot get a job because his social security card was stolen when he was mugged and he needs this information to update his immigration status.  Father feels he should be able to renew his immigration status within six months.  Once he updates his immigration status, Father believes he will be able to secure a job and housing.

{¶13} The guardian ad litem stated she had an opportunity to see N.R. and Father interact during Goodwill parenting.  While she characterized the visit as

"positive," her recommendation is that it is in N.R.'s best interest for the trial court to grant SCDJFS's motion for permanent custody.

{¶14} Pursuant to a judgment entry filed on January 10, 2013, the trial court terminated Father's parental rights and granted permanent custody of N.R. to SCDJFS. The trial court found N.R. could not be placed with either parent at this time or within a reasonable period of time and N.R. has been abandoned because Father failed to visit or maintain contact with N.R. for more than ninety (90) days.  The trial court further found it is in the best interest of N.R. that permanent custody be granted to SCDJFS.

{¶15} Appellant now raises the following assignments of error on appeal:

{¶16} "I. THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR A FIRST SIX MONTH EXTENSION.

{¶17} "II. THE TRIAL COURT'S FINDING THAT PERMANENT CUSTODY WAS IN N.R.'S BEST INTEREST WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

*Burden of Proof & Standard of Review*

{¶18} This case comes to us on the accelerated calendar. App. R. 11.1, which governs accelerated calendar cases, provides, in pertinent part:

> (E) Determination and judgment on appeal. The appeal will be determined as provided by App. R. 11. 1. It shall be sufficient compliance with App. R. 12(A) for the statement of the reason for the court's decision as to each error to be in brief and conclusionary form. The decision may be by judgment entry in which case it will not be published in any form."

**{¶19}** One of the important purposes of the accelerated calendar is to enable an appellate court to render a brief and conclusionary decision more quickly than in a case on the regular calendar where the briefs, facts and legal issues are more complicated. *Crawford v. Eastland Shopping Mall Assn.*, 11 Ohio App.3d 158, 463 N.E.2d 655(10th Dist. 1983).

**{¶20}** This appeal shall be considered in accordance with the aforementioned rules.

**{¶21}** "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). An award of permanent custody must be based on clear and convincing evidence. R.C. 2151.414(B)(1).

**{¶22}** Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477. If some competent, credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

**{¶23}** Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal v. Cleveland,* 10 Ohio

St.3d 77, 80, 461 N.E.2d 1273 (1984).  Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well."  *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

*Best Interest*

**{¶24}** Father argues the trial court erred in finding permanent custody was in N.R.'s best interest.  We disagree.  We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned."  *In re Mauzy Children,* 5th Dist. No. 2000CA00244, 2000 WL 1700073 (Nov. 13, 2000), citing *In re Awkal,* 85 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist. 1994).

**{¶25}** In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child and (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody.

**{¶26}** The focus of the "best interest" determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re: Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist. 1994).

**{¶27}** In this case, Singleton testified N.R. has been in the same foster home since October 2011 and is healthy after he went through treatment and therapy on his hands. N.R. is bonded with his foster mother who nursed him back to health after the injuries to his hands and he is traumatized when separated from her. N.R. has a consistent routine every day, including attending preschool. While Singleton did observe a bond between Father and N.R. when the case plan started, the bond has been severed due to the lengthy separation from April 2012 to September 2012 when Father did not visit N.R. Singleton stated it is her opinion the benefit of stability and permanency outweighs any harm of N.R. not seeing Father and Father cannot provide the same stability N.R. currently enjoys. Thus, she believes it is in N.R.'s best interest for permanent custody to be granted to SCDJFS and she does not believe additional time would correct the damage done by appellant failing to visit N.R. and failing to address the concerns noted with his ability to parent. Further, the guardian ad litem, even after observing a "positive" visit between N.R. and Father, made the recommendation that it is in N.R.'s best interest for the trial court to grant SCDJFS's motion for permanent custody. Accordingly, we find that clear and convincing evidence supports the trial court's conclusion that it is in the best interest of N.R. to grant permanent custody to SCDJFS.

*Motion for Six-Month Extension*

**{¶28}** Father argues the trial court erred when it denied his motion for a first six-month extension of temporary custody. We disagree. A trial court's decision to grant or deny an extension of temporary custody is a discretionary one. See R.C. 2151.415(D)(1) and (2). Pursuant to R.C. 2151.415(D)(1), a trial court can extend temporary custody for six months only if it finds, by clear and convincing evidence, (1) that such an extension is in the best interests of the child, (2) that there has been significant progress on the case plan, and (3) that there is reasonable cause to believe that the child will be reunified with a parent or otherwise permanently placed within the period of extension. See *In re McNab*, 5th Dist. Nos. 2007 AP 11 0074, 2007 AP 11 0075, 2008-Ohio-1638.

**{¶29}** While Father has completed certain aspects of the case plan, Father has continually waivered in his compliance with the case plan. Father initially completed the parenting evaluation. However, despite being referred to Goodwill parenting in February of 2012, he did not begin the program until September of 2012. Father stated he did not begin Goodwill parenting until September because he thought attendance was simply a recommendation and he had other "stuff I had to do." Further, Father failed to visit N.R. from April to September of 2012. Father testified he was mugged on July 4, 2012, and was in the hospital for a week. However, when asked why he did not visit from April to July or after he was released from the hospital in July to September, Father stated he was homeless and had no transportation.

**{¶30}** Father has not had employment or independent housing since the case was filed. Singleton attempted to assist Father with housing by referring him to Stark

Social Worker's Network, but Father was unable to fully utilize their services due to his lack of communication with the agency. Singleton testified she does not believe Father can provide care and support for N.R. because he does not have housing or employment.  Singleton doubts N.R. could be placed with Father within six months because Father would still not be stable in six months in terms of maintaining a home, maintaining employment, and meeting the basic needs of N.R.  Father believes he can renew his immigration status within six months and then gain employment and housing within this time period because he is working with various entities to assist him with his immigration status.  However, at the time of the hearing, Father had not yet been assigned an immigration attorney or obtained an application for a "green card of permanent residence," despite having the time period from when his social security card was stolen in July to the hearing date in December to complete these tasks.

{¶31} Despite Father's involvement with the Goodwill parenting program, significant concerns remained with his ability to care for N.R.  Fire testified Father continually did not come prepared with food or supplies when visiting N.R.  Further, while Father did well in the classroom portion of the program, he was frustrated and short-fused with N.R.  Fire was not able to complete a home visit, a standard part of the Goodwill parenting program, because Father did not maintain independent housing.  Fire stated despite Father's completion of Goodwill parenting, she would not recommend unsupervised visitation between N.R. and Father because of Father's frustration with N.R. and her doubts as to Father's ability to care for N.R.  Fire has concerns with Father's ability to provide for care and support of N.R. because of his lack of stability and consistency.  She was particularly concerned with a visit shortly before

the hearing on the motion for permanent custody when Father became frustrated with N.R. during a two-hour visit and had to walk away from N.R.

{¶32} We find appellant has failed to demonstrate an abuse of discretion by the trial court in denying the motion for six-month extension. The testimony reflects that because of Father's decisions in belatedly starting the Goodwill parenting program, in failing to visit N.R. from April 2012 to September 2012, and in failing to obtain employment or housing, Father has failed to make significant progress in his case plan. Further, based on the evidence presented, there is not clear and convincing evidence that a reasonable likelihood of reunification exists in the next six months. Father is homeless, unemployed, has only begun to address the concerns regarding his parenting skills, and appears to be only in the beginning stages of renewing his immigration status. As set forth more fully above, the evidence before the trial court supports the conclusion that an extension of temporary custody is not in N.R.'s best interest, but, rather, his interests are best served by an award of permanent custody to SCDJFS.

{¶33} Based on the foregoing, we find that the trial court did not err in awarding permanent custody of N.R. to SCDJFS or by denying Father's motion for six-month extension.

{¶34} Appellant's Assignments of Error I and II are therefore overruled.

{¶35} For the foregoing reasons, the judgment of the Stark County Court of Common Pleas, Juvenile Division, is affirmed.

By Gwin, P.J.,

Delaney, J., and

Baldwin, J., concur

_____

HON. W. SCOTT GWIN

_____

HON. PATRICIA A. DELANEY

_____

HON. CRAIG R. BALDWIN

WSG:clw 0515

[Cite as *In re N.R.*, 2013-Ohio-2327.]

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO

FIFTH APPELLATE DISTRICT

IN THE MATTER OF N.R.     :
               :
               :
               :
               :
               :     JUDGMENT ENTRY
               :
               :
               :
               :     CASE NO. 2013CA00021

For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas, Juvenile Division, is affirmed. Costs to appellant.

_____
HON. W. SCOTT GWIN


_____
HON. PATRICIA A. DELANEY


_____
HON. CRAIG R. BALDWIN